1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CAUSE NO. 1:19-cv-02277-JPH-DLP

| | |
|---|---|
| GORDON MITCHUM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| CITY OF INDIANAPOLIS, | ) |
| INDIANAPOLIS METROPOLITAN | ) |
| POLICE DEPARTMENT ("IMPD") | ) |
| and in their official and | ) |
| individual capacities, the | ) |
| following IMPD officers | ) |
| BRYAN ROACH, CRAIG HEDDEN, | ) |
| MOLLY GROCE, TOM WHITE, | ) |
| RICHARD FAULKNER, ALFRED | ) |
| ROBINSON, and DOGS 1-50, | ) |
| CITY OF INDIANAPOLIS, et al., | ) |
| | ) |
| Defendants. | ) |

The video deposition upon oral examination of MICHAEL GOOSBY, a witness produced and sworn before me, Joyce Shinault, RPR, a Notary Public in and for the County of Shelby, State of Indiana, taken on behalf of the Plaintiff via Zoom videoconference, taken on February 16th, 2021, commencing at 1:00 p.m. ET, pursuant to Indiana Rules of Procedure, with Notice as to the time and place thereof.

FILLENWARTH REPORTING SERVICE
775 Hummingbird Lane
Whiteland, IN 46184
(317) 345-6179

Michael Goosby
February 16, 2021

### Page 38

1  A. Yes, we do.  We do -- we do it via ground
2     units, all the ground units and the
3     helicopter, that is correct.
4  Q. When you say ground units, you mean through
5     the speaker on the police car, right --
6  A. That is correct.
7  Q. -- the external speaker?
8  A. That is correct.
9  Q. And you do that because that's the best
10    practice to warn people in the area, correct?
11 A. Well, we do that because it's -- it is a best
12    practice, yeah, you need to let people know
13    that the dog is going to be out searching,
14    but more importantly, though, you're giving
15    this suspect the chance to surrender.
16 Q. Well, also, you can prove that you gave the
17    announcement, right?  I'm sure there's a way
18    for you to show that the announcements were
19    given when you could give them
20    electronically, right?
21 A. Well, we do all -- what happens is, there's
22    nothing -- when you talk through the PA,
23    there's no time stamp on the PA.  However, we
24    do say it on a recorded frequency that the
25    announcement is about to be given.  And then

### Page 39

1     once the announcement is given, we have the
2     unit that gave the announcement, they get
3     ahold of the incident commander at the
4     command post, and they advise the incident
5     commander of their location of the perimeter,
6     what their shop number or car number is, and
7     their officer serial number who gave the
8     announcement.  And then they -- we -- then
9     the incident commander has someone at the CP
10    memorialize that, and then we take note to
11    that, and then we take those notes and we put
12    them in our K-9 department report to show
13    where the announcement was given, who heard
14    it, and the exact location where it was and
15    the time.  And if it was given in English or
16    Spanish.
17 Q. So we can agree that it's important to give
18    announcements, right, to warn --
19 A. Without a doubt.
20 Q. -- people in the community, right?
21 A. Without a doubt.  Yeah.
22 Q. We can agree that it's important to be able
23    to show you gave announcements, right?
24 A. Without a doubt.
25 Q. Okay.  Let's go to the 2015, '16, or '17

### Page 40

1     training with the E-collars.  What was
2     different between then and 2010, if anything?
3  A. Not much because there were newer officers in
4     the unit, new dogs, different dogs.  So it
5     wasn't -- there wasn't much difference.  I
6     think that -- I think -- I think one of the
7     biggest changes may have been the fact that
8     we're using a different type of E-collar, a
9     newer version of E-collar, which offers a lot
10    more flexibility.  And some of the tactics
11    changed in how we operate the E-collar and
12    how we use it.  So those are probably the
13    differences.  More of the difference probably
14    came from my end than say, IMPD's end.
15 Q. Well, what -- you said something about team
16    tactics earlier.  What team tactics did you
17    teach in 2015, '16, and '17?
18 A. I taught -- we did search team tactics where
19    I was, again, showing them how we operate,
20    and using a K-9 handler with a point officer
21    and rear guards to the search team.  Again,
22    though, you know, I can only show that, and
23    it's still resource driven.
24       I have 10,000 officers at my
25    disposal, so I can have a search team on

### Page 41

1     every K-9 search, which is what we do, you
2     know.  But some jurisdictions I'm training in
3     and teaching in, they can't do that.
4     Sometimes their whole unit working, their
5     whole watch working is four officers, and
6     three of them may be on a perimeter and one
7     is a K-9 handler.  So it depends on where
8     they are.  But I just teach the best
9     practices on how we do things.
10 Q. Well, and you would say -- you would agree
11    with me that LAPD, one of the things you
12    consider in your best practices is the safety
13    of the community, correct?
14 A. Yes.
15 Q. Right.  And these best practices are
16    designed, in fact, to -- one of the things
17    you consider is to keep bystanders or
18    civilians or people in their house or on
19    their porch safe, right?
20 A. Yes.
21 Q. Okay.  So in -- in the 2010, 2015 and the
22    next -- or '16, '17, what was the next time
23    you did some training -- strike that.
24       Did you do any other trainings for
25    IMPD after 2015, '16 or '17?

### Page 42

1  A. Yes.
2  Q. When was that one?
3  A. This was just recently. Most recently last
4     year, I spent a week there going over
5     classroom training with them, with some
6     classroom sessions.
7  Q. Okay. Did you generate any written materials
8     for your 2010 -- we'll call it a 2015
9     training. I'm not holding you to '15, '16,
10    or '17, but the 2010, 2015, 2020 training,
11    did you generate any written materials for
12    the IMPD officers?
13 A. No, I did not.
14 Q. Who from IMPD contacted you to do the 2020
15    training?
16 A. Lieutenant Stradling did.
17 Q. And did he -- how did he contact you, by
18    email or phone?
19 A. He sent me a text. Yes, he contacted me by
20    text first, and then we were texting back and
21    forth, and -- he may have emailed me. He may
22    have emailed me a couple times.
23 Q. Okay. And you said that was Lieutenant
24    Stradling?
25 A. That's correct.

### Page 43

1  Q. Did you get paid to do this training?
2  A. I did.
3  Q. And how much?
4  A. $5,000.
5  Q. Was it to you or to LAPD?
6  A. It was to me, to my company. I was there
7     as an --
8  Q. What's your company?
9  A. Pro K-9 Limited Liability Company.
10 Q. Can you say it again, what's your company
11    called?
12 A. Pro K-9 Limited Liability Company.
13 Q. Okay. Is it owned by you exclusively or do
14    you have any partners?
15 A. No, it's owned by me exclusively.
16 Q. Okay. So you -- have you ever been asked to
17    evaluate IMPD's K-9 program?
18 A. Yes. That was the last training I was there.
19 Q. Okay. That is the fall of 2020 --
20 A. Well, I wouldn't say evaluate. They were
21    going to implement some new policies and
22    procedures, and they wanted me to go over
23    their policies and procedures and help them
24    with their best practices.
25        Yes, I guess that was evaluating. I

### Page 44

1     take that back. I was evaluating, yes.
2  Q. Now, was that separate from the training you
3     were paid $5,000 to do?
4  A. No, it was all part of that.
5  Q. Okay, okay. All right. So did you generate
6     a report as part of that training?
7  A. I did.
8  Q. Or strike that. Yeah, as part of that
9     evaluation, did you generate a report?
10 A. I did.
11        MR. LITTLE: Okay. Could we
12 put -- now, this is going to be weird because
13 I can't see it. Joyce, would you mind
14 putting Officer Goosby's -- Mike's report up
15 on the screen in Zoom, and I'm going to track
16 down the -- I'm going to look at the actual
17 document.
18        THE WITNESS: I can't see
19 anything, just so you know, because I see a
20 picture of myself.
21        MR. LITTLE: Oh, okay. Okay.
22 Let's -- let's take a break for one second,
23 and if you can just stay on the line, let's
24 work out how we can get Mike the exhibit so
25 that we can all know what we're talking about

### Page 45

1  here.
2        Do you have a way to read -- if we
3  email them to you, can you read them?
4        THE WITNESS: I have a copy. I
5  mean, I have my own copy of it. So I'm just
6  letting you know, if you're going to put
7  bullet points on the screen, I won't see
8  bullet points that you see. You'll need to
9  voice those to me.
10       MR. LITTLE: Okay, yeah, I just
11 want you to -- to -- we'll do this. I just
12 want you to see the -- for this exhibit, if
13 you have a copy of the report, that's --
14 that's good enough.
15       THE WITNESS: Okay.
16       MR. LITTLE: We'll just maybe
17 describe it so that we can, you know, make
18 sure we're talking about the same thing. We
19 can go back on the record, then.
20       VIDEOGRAPHER: We never went off
21 the record.
22       MR. LITTLE: Oh, good. Okay.
23 BY MR. LITTLE:
24 Q. So, Officer Goosby, I'm looking at what I'm
25    going to mark as Exhibit 1, which is a

Michael Goosby
February 16, 2021

**Page 58**

advantage where we can't see his hands, can't see him, and he is reasonably believed to be armed. And he is not giving up, he is not coming out to us. So we are going to now set inner containment around that, and slow it down and turn it over to SWAT. He's going to become a barricaded suspect.

Q. You mentioned earlier that a lot of the incidents or the incidents that LAPD has had where things have gone wrong were from officers doing stupid shit. Do you remember saying that?

A. Yeah, I did.

Q. Yeah, yeah, yeah. Does the -- does taking a dog out with a hard-out, does that fall into the category of stupid shit?

A. No. Not at all because there's times you may have to. If you have a suspect that's fighting a dog and he's holding on to the dog, and you can't call that dog back because the suspect is holding him, you may have to go up to that suspect and dog and jump in the middle of that and get that dog off. You may have to hard-out that dog. So no, I don't find that stupid at all. But I don't think

**Page 59**

it should be the norm, it should be the exception.

Q. When LAPD, you know, has an off -- a dog, and it's engaged in a bite, you guys tell your non-K-9 officers to not go into that scrum with the dog and the suspect, correct?

A. That's correct.

Q. Why do you tell them that?

A. We don't want them going in there because the dog is now in defense and he is in fight threshold of defense. And we don't need that officer getting in the middle of that and the dog thinking the officer is coming to attack them and end up getting bit or whatever.

And it's just not safe. We prefer to call the dog back to us, and then order the suspect back -- order the dog back to us and then order the suspect out. That's 90 percent of the way we do it, that's 90 percent of the way it goes down.

Q. Okay. Because the dog can't tell the police officer from the suspect, right? The dog is there to bite a human. He's engaged in what he's been trained to do, which is to bite, correct?

**Page 60**

A. He's not -- he's -- he can be trained -- he's trained to bite in response to certain things, our dogs are, yes. But most police doings are trained to bite, that is correct, yes. But the dog --

Q. And when they're --

A. We don't need this -- we don't need the officer now -- the other officer now clouding the subject. We don't have any independent contractors on our search team. All of our search team are -- we call them union members. And on the union team, everybody has a job. So we don't want them doing anything independent of what the handler tells them to do.

Q. Well, right, I agree with you. But I mean, you would agree with me, you don't want the non-K-9 officer getting into that scrum; one of the reasons being the non-K-9 officer could get bit, right?

A. Yeah, but handlers could get bit, too, for that matter. But yeah, that's one of the reasons, but that's not the main reason.

Q. Okay. You would agree with me that the dog -- that a dog can't tell an innocent person

**Page 61**

from a suspect, correct?

A. No, I wouldn't say -- I wouldn't say that all the time. But oftentimes, no, they probably can't, you know. But it depends on the dog. You know, our dogs are very -- they become, we call seasoned. What I mean by that is, they will bypass certain people knowing that's not the -- what you're looking for, so to speak.

Q. Are you aware -- when you were in Indianapolis, were you made aware that IMPD trained their dogs that the, quote, bite is the reward? That's the motivation they use when they train their dogs?

A. No, never heard the term, bite is the reward.

Q. Okay.

MR. LITTLE: Can we send Officer Goosby via email maybe, Annie, the Instagram post of Officer Groce?

MS. ALONSO: Yeah, I can do that.

MR. LITTLE: Okay. If you could send him that.

BY MR. LITTLE:

Q. Okay. Now, did you meet with Molly Groce when you were in Indianapolis, do you

16 (Pages 58 to 61)

**Page 62**

1    remember?
2    A.  I met her, yes.  I didn't meet her, but I met
3        her.  She was part of the group -- she was
4        part of -- one of the days the group came in,
5        she was part of the group.
6    Q.  How many people were in that group?
7    A.  I think each day was probably -- had 8 to 10
8        each day.  And then -- that's at the
9        beginning, Monday, Tuesday.  Then it started
10       dwindling down to just the supervisors and
11       trainers towards the mid on end of the week.
12   Q.  Okay.  Do you -- did you have any
13       conversations specifically with Molly Groce?
14   A.  No.
15   Q.  Did you discuss this case with anybody in
16       Indianapolis other than Andrew?
17   A.  No, we really -- he and I really didn't
18       discuss this case, to be honest with you.  He
19       told me that they had a pending litigation
20       for a dog bite of -- with Molly's dog, an
21       elderly gentleman that got bit during a K-9
22       search.  But that's pretty much how much he
23       went into it.
24   Q.  Did you review any records about this case or
25       the complaint or anything?

**Page 63**

1    A.  No, sir, I did not.
2    Q.  Okay.  Did you talk about any other cases of
3        civilians being bitten by IMPD dogs while you
4        were in Indianapolis?
5    A.  No.
6    Q.  Okay.  Do you have any notes from your visit
7        to Indianapolis in the fall of 2020?
8    A.  I do not.  I gave them to you.  I gave you
9        the summary that I wrote up.
10   Q.  Do you have any drafts of that summary?
11   A.  No, I didn't save any of those.
12   Q.  Were you provided any documents to review
13       while you were evaluating IMPD?
14   A.  No.  The only thing I was provided was their
15       old K-9 policies.
16   Q.  How did you get that?
17   A.  I think Lieutenant Stradling gave it to me
18       when I got there.
19   Q.  In -- like in paper?
20   A.  Yes.  He may have emailed it to me before.  I
21       can check.  I don't remember.  He may have
22       emailed it to me before, too, but I know he
23       gave me a copy when I was there.  But he may
24       have emailed it to me as well.
25   Q.  Let's talk about it.  Do you have any

**Page 64**

1    comments on IMPD's old Use of Force policy?
2    A.  I don't have it with me so I don't really --
3        I can't really speak to it.  But I just know
4        what I recommended that we do, what they go
5        to.
6            MR. LITTLE:  Annie, can you email
7    him what we'll mark as Exhibit -- let's make
8    the Instagram one Exhibit 2, and the IMPD Use
9    of Force policy Exhibit 3.  Can you email him
10   that, too?
11           MS. ALONSO:  Yeah, I just
12   emailed --
13           THE WITNESS:  I just got the -- I
14   just got the Instagram post thing.
15           MS. ALONSO:  Great.
16           THE WITNESS:  And I'm looking for
17   it to come up here.  Hold on one second here.
18   I don't know.  It's saying something like,
19   FAQs, frequently asked questions, is that it?
20           MR. LITTLE:  Yes, that's it.
21   Right, right.  It's two columns?
22           THE WITNESS:  Yes.  Okay, I have
23   that.
24   BY MR. LITTLE:
25   Q.  I'm going to represent to you this is an

**Page 65**

1    Instagram post with thousands of -- Instagram
2    account with thousands of followers for a dog
3    named Obi, O-B-I, maintained by Molly Groce.
4         Molly is answering the questions
5    in -- Molly's writing is blue, and the
6    questions are in white.  So I'm looking at
7    the upper right corner --
8    A.  Okay.
9    Q.  -- the question of Nicole --
10   A.  Nicole Fischer?
11   Q.  -- Fischer.  Yes, sir.  Yeah, do you see
12       that?
13   A.  I see it.
14   Q.  So take a look at that real quick.
15   A.  (Witness reading sotto voce.)  Ah.
16   Q.  Okay.  Is that a safe way to train police
17       dogs, in your opinion?
18   A.  I'm not going to use the word, safe.  I think
19       it's -- I don't agree with that.  You know,
20       for us, a bite is not a reward.  You know,
21       for us, a dog finding a suspect is a reward.
22       And now a bite may be a by-product of the
23       find, but the goal is to find the suspect.
24   Q.  Okay.  All right.  Let's do this.  Let's take
25       about a ten-minute break, if you could, Mike,

**Page 66**

1  and review the...
2      MR. LITTLE: Annie, did you send
3  him -- did you get the five-page Use of Force
4  principles from General Order 1.3?
5      MS. ALONSO: Yes. I just sent
6  it.
7      MR. LITTLE: Okay. Could you
8  take -- could we take about ten minutes here,
9  and Mike, would you mind reviewing that
10 document for me?
11     THE WITNESS: Okay. Am I
12 reviewing the whole policy or just pertaining
13 to K-9?
14     MR. LITTLE: I'm going to ask you
15 mostly about stuff that's pertaining to K-9s,
16 but I am going to ask you in general -- you
17 know, I have some theoretical policing beefs
18 with IMPD as well, and their use of force,
19 that I would like to ask you about. And so
20 I'd ask that you could read the whole thing
21 again. And I'm going to ask you about that
22 and how -- some of the comments in your
23 report. Okay?
24     THE WITNESS: Okay.
25     MR. LITTLE: All right. So we

**Page 67**

1  can take a ten-minute break, if that's all
2  right with everybody.
3      VIDEOGRAPHER: This is the
4  videographer. This will mark the end of
5  Media 1. We are going off the record at
6  2:12.
7      (Whereupon, a recess was taken.)
8      VIDEOGRAPHER: We are back on the
9  record. It is 2:29. You may proceed. Thank
10 you.
11 BY MR. LITTLE:
12 Q. All right. Mike, let's take a look at your
13    report --
14 A. Okay.
15 Q. -- which is marked as Exhibit 1. And you
16    testified this is the entire report, is that
17    correct?
18 A. That's correct, sir.
19 Q. Why did you title it "Summary", then?
20 A. I guess it's a summary of what we talked
21    about. I don't know.
22 Q. I mean, to me, summary indicates that there's
23    a longer report behind it. Did anybody ask
24    you to write a longer report?
25 A. No.

**Page 68**

1  Q. Okay. Are you planning on writing --
2  A. I did a summary of what I was contacted to
3     do, and then I wrote it.
4  Q. All right.
5  A. I'm less of a writer and more of a doer,
6     hands-on guy.
7  Q. Okay. So you're not planning on writing a
8     longer report at another time for IMPD.
9  A. No, that's done. That's it.
10 Q. And if IMPD asked you to write another
11    report, you would expect to be paid
12    additional money, right, because you
13    fulfilled your work for the 5,000?
14 A. Yes.
15 Q. Okay. So let's go to the review process.
16 A. Okay.
17 Q. So it's an assessment of current K-9 policies
18    and procedures. Which K-9 policies and
19    procedures did you assess?
20 A. The stuff they were doing -- the things they
21    were doing then.
22 Q. Do you -- did they give you any documents?
23 A. I told you before, the lieutenant gave me a
24    document, gave me the policies when I was
25    there, and I believe he may have emailed it

**Page 69**

1     to me prior to me going there.
2  Q. Is that different than the exhibit that I
3     gave you, General Force Order 1.30?
4  A. What you gave me, I don't see anything K-9
5     related on there.
6  Q. Okay. So you reviewed a different document?
7  A. Yes. There were K-9 policy and procedures
8     like that.
9  Q. Okay.
10 A. Yes.
11 Q. A review of -- okay. You said next a review
12    of other agencies' K-9 policies and
13    procedures. What other agencies' K-9
14    policies and procedures did you review to
15    make this report?
16 A. I reviewed over the years, many departments.
17    I just kind of scanned over some of them to
18    see where they fell in line with IMPD.
19 Q. So where did they fall with IMPD?
20 A. They pretty much all fell around the same
21    area. They fall -- I mean, IMPD wasn't too
22    far off from everybody else, to be honest
23    with you.
24 Q. They weren't?
25 A. No.

Michael Goosby
February 16, 2021

**74**

1  assist with.
2  Q. Why were they interested in changing their
3     policy?
4  A. I think that Lieutenant Stradling said that
5     they -- he thought they could do things a
6     little better, and he wanted some more
7     oversight. And we discussed how we did
8     things and how we provided command control,
9     and he liked that idea. And I think that's
10    where it came from. I'm pretty sure that --
11    I'm guessing, but your -- this litigation
12    might have something to do with it, I don't
13    know.
14 Q. Did --
15 A. But people change things because there's
16    reason to change, sure. They find a reason
17    they want to change things.
18 Q. So why -- what reasons to change? I mean,
19    you make some recommendations in here, which
20    we'll get to. What reasons to change do you
21    see for IMPD in their K-9 deployment?
22 A. One of the things I saw, I -- I saw there was
23    not as much command control. And that was --
24    that's a big deal in our department.
25    That's -- my foundation is built from that,

**75**

1     and oversight. And I saw -- I saw lapses in
2     that, in my opinion.
3  Q. So tell me about those. What lapses did you
4     see?
5  A. Well, I just saw where they never had a
6     significant or an established command post at
7     their incidents; where people check in, get
8     jobs, and then check out. They didn't have
9     necessarily a K-9 supervisor on every K-9
10    request.
11 Q. Why is that important?
12 A. I think it's important because that gives you
13    one more layer of oversight. You know, I
14    think, in my opinion, as K-9 handlers -- I
15    was one for a lot of years -- we go out there
16    with tunnel vision sometimes. Our tunnel
17    vision is to go out and find the bad guy,
18    find the bad guy. And sometimes, you know,
19    you need someone to look at the bigger
20    picture, and ensure that we're dotting all
21    the I's and crossing all the T's to ensure
22    that criteria is being met, ensure that best
23    practices are being met, ensure that we're
24    following both prongs of officer safety,
25    physical safety and fiscal safety. You know,

**76**

1     so we think differently as supervisors than
2     handlers do. I know I do -- I did.
3  Q. So is IMPD's lack of supervision, is that --
4     is that causing problems or -- in your
5     opinion, for IMPD?
6  A. I didn't say there was a lack of supervision.
7     I just said that they didn't -- I thought
8     they could do a better job at it. And as far
9     as causing problems, I don't know if it's
10    causing problems with them, but I could see
11    where it could cause problems with them. You
12    know, I know that there were complaints of
13    the fact that, you know, State Police could
14    show up and do a K-9 search in their city
15    without anyone from IMPD K-9 either
16    acknowledging it or being aware of it, and
17    that's not a good thing. Because that brings
18    risk, and that's another agency bringing a
19    risk into the city. So I think there needs
20    to be better control over stuff like that.
21       I think that if a K-9 handler responds
22    down to a search, then a K-9 sergeant needs
23    to go to step in and ask certain questions
24    and make sure certain I's are being dotted
25    and T's are being crossed, again. It should

**77**

1     be a supervisor who is over the patrol side
2     of things, and they discuss it amongst them
3     as the best way to go forward to ensure the
4     department policies and procedures are being
5     followed. There's never -- there's nothing
6     wrong with oversight. I'm not talking about
7     micromanaging, I'm just talking about
8     management, period.
9  Q. Well, let's take a look at your
10    recommendations.
11 A. Sure.
12 Q. Your first recommendation, you recommend --
13    well, you -- before I ask you that, you would
14    agree that using a dog, a police dog, is a
15    use of force, correct?
16 A. Well, surprisingly, sir, with the Los Angeles
17    Police Department it is not a use of force.
18 Q. How is that?
19 A. Well, our dogs -- our city attorney has
20    advised our -- our policing unit has advised
21    our department, and we -- since 1980, when
22    our dogs were first started, we have not ever
23    used the dogs as a use of force.
24       Now, there is talk about using as a
25    use of force if -- or designated as a use of

Michael Goosby
February 16, 2021

Page 78

1  force if a dog is sent on a bite to a
2  suspect, if a directed bite is given. But
3  our dogs are locating tools. We use our dogs
4  to search. Our dogs are trained in a find
5  and bark method. And we give warnings and
6  announcements, and so on and so forth, and if
7  the suspect doesn't fight or try to escape,
8  and stays still, the dog will bark at him,
9  we'll call the dog back and take the guy into
10 custody. If he tries to fight or escape, he
11 will get bit.
12 Q. So IMPD's dogs are not trained to find, are
13    they; they're trained to bite, correct?
14 A. They're trained to find and bite. They are
15    trained to find. Because you can't -- if
16    you're not finding them, then you're probably
17    not biting, unless you use that dog as a
18    force tool.
19 Q. When an IMPD dog finds a person, he's going
20    to bite them, right; that's how they're
21    trained?
22 A. If they can get to them they probably will,
23    yes.
24 Q. Okay. And the goal of a dog biting a suspect
25    is to take control of the suspect, right, so

Page 79

1  you can apprehend them?
2  A. That's generally their thought process, yes.
3  Q. Okay. And you would agree with me that a dog
4     doesn't have, you know, human judgment,
5     right? He doesn't have -- it doesn't have a
6     human thought process, correct?
7  A. No, he doesn't.
8  Q. And you would agree with me between the dog
9     and the officer, it has to be the officer's
10    decision as to whether or not to use, you
11    know, use the bite, whether or not to have
12    the dog engage, right? That's got to be the
13    officer's decision because the dog is not
14    capable of making that decision, right?
15 A. Well, no, but dogs are -- no, I disagree with
16    you there because dogs aren't
17    decision-makers. Dogs are conditioned to do
18    certain things under a certain set of
19    circumstances. So, for example, I'll use our
20    department. If my dog is searching and he
21    goes into a bush and he finds a suspect
22    there, and I'm behind cover, behind a tree
23    that's maybe ten feet from the bush, he goes
24    in, finds the suspect, starts barking. I
25    call the dog back, I order the suspect out.

Page 80

1  He comes -- he comes out, we take him into
2  custody, no harm, no foul.
3     Same scenario, my dog goes in the bush,
4  he goes to bark, the suspect kicks him, my
5  dog bites him. I hear the dog bite -- I hear
6  the suspect yell out, I call the dog back off
7  from the bite. What did I do differently in
8  that scenario as an officer.
9  Q. Okay. But you would agree with me that that
10    scenario described, describes dogs that are
11    trained differently than IMPD, correct?
12 A. That's correct. But you said that the
13    officer makes the decision, and I'm showing
14    you how that's not totally the way it works
15    out.
16 Q. Okay. Fair enough. But if a dog -- a dog
17    that is trained the way -- how does IMPD
18    train their dogs, as you understand it?
19 A. They train their dogs to find and bite, as
20    most departments in the United States do.
21 Q. Okay. And they train their dogs to find and
22    bite --
23 A. Yes.
24 Q. -- and so when an IMPD officer says hey, Obi,
25    go find -- you know, go into track mode, as

Page 81

1  they call it here at IMPD, when Obi is in
2  track mode and he finds a person, he's going
3  to bite them, correct? That's how IMPD
4  trains their dogs.
5  A. Well, that -- he is trained -- his final
6     response, if he can get to the suspect or
7     does get a suspect, would be to bite. Yeah,
8     that's the conditioned response, yes.
9  Q. Right. And --
10 A. However, obviously circumstances may dictate
11    that.
12 Q. But Obi or any IMPD -- strike that.
13    Any dog, any IMPD K-9 is not going to be
14    able to tell the difference between a suspect
15    and an innocent person if there's no clues as
16    to the suspect, correct?
17 A. That would be -- again, I don't -- I can't
18    say that. I can't say that because I'll give
19    you an example. My first dog, we were
20    searching for an armed robbery suspect. And
21    we're searching along, and he jumps into --
22    we were searching the area of an abandoned
23    house. And the abandoned house, one side of
24    the walls are off of it. The dog got inside
25    the room of the house, and he went to a

21 (Pages 78 to 81)

Fillenwarth Reporting Service
317.345.6179

### Page 90

1. a dog search for a suspect than have an
2. officer search for a suspect, without a
3. doubt.
4. Q. Right. But can you refer me to any studies
5. or peer reviewed literature that says that?
6. A. No. I can refer you to 24 years' experience.
7. Q. Okay. Can you refer me to any studies or
8. peer reviewed literature on the efficacy of
9. using a dog bite to control a suspect?
10. A. I haven't done a study on that, no. I
11. haven't looked any of that up, no.
12. Q. How about studies or peer reviewed literature
13. about dog bites making policing safer for
14. officers?
15. A. I'm sure there's stuff out there. Again, I
16. haven't -- I haven't searched for those
17. things, or looked for them.
18. Q. So the ans- --
19. A. I'm sure there's some out there, though, if
20. you can check.
21. Q. But you don't know -- you can't refer me to
22. any or name any right now, right?
23. A. No. I am not. No, I cannot.
24. Q. What about studies showing that using K-9s
25. makes it safer for civilians, any studies

### Page 91

1. about that?
2. A. No, I can't refer you to any of those, no.
3. Q. Okay. And so let's keep going with your
4. recommendations here. Directed bite, the K-9
5. officer may direct his bite to a suspect or
6. apprehend a fleeing suspect or otherwise
7. evading suspect. All right. We'll skip to
8. the next one.
9.     What -- the next one, the department
10. should reassess the mission of the K-9 unit.
11. What -- what is the objective of the IMPD K-9
12. unit?
13. A. I have the thing. I don't remember what it
14. said. But something must have stuck out to
15. me is why I put this in there. But I don't
16. have it in front of me to refer to it.
17. Q. Well, so it looks like you think the
18. objective of the K-9 unit should be to search
19. for and locate suspects, correct?
20. A. Yes.
21. Q. And that's --
22. A. Yes. Yeah, I don't think that they
23. should use -- I don't -- I don't -- I
24. don't -- again, I'm going by my foundation,
25. training, background, experience, and

### Page 92

1. knowledge. I don't think that dogs should be
2. used as use of force tools.
3.     For example, we have a car in front
4. of us, driver doesn't want to come out. I'm
5. not a big fan of sending a dog in to drag
6. this guy out of the car. I think there
7. should be other tools.
8.     However, the caveat to that, though,
9. is, the department needs to provide the
10. officers with the necessary tools to
11. effectively do those jobs without using a
12. dog.
13. Q. Okay. So what --
14. A. The dog should be the very last option.
15. Q. So what should IMPD -- I was going to ask you
16. this coming up, what -- what should IMPD be
17. providing their officers that they're not
18. right now?
19. A. I think they should provide them -- you know,
20. again, this is resource driven and money
21. driven. But I think in a perfect world,
22. they'll provide them with gas -- handheld
23. gas, OC-based gas. They provide them with
24. less lethal munitions, such as beanbags and
25. 40 millimeter and tasers. Those things can

### Page 93

1. bring a lot of incidents to fruition without
2. a dog bite, sometimes without using a dog.
3. Q. And do you have those tools at LAPD?
4. A. Yes, we do.
5. Q. And do you think that having those tools
6. would cut down on the number of -- well, you
7. just said, so I'm going to ask you this: Do
8. you think those tools that you have at LAPD
9. have cut down on LAPD's number of dog bites?
10. A. No, I wouldn't say that because we don't use
11. our dogs in that manner anyway. However, I
12. will say it cuts down on some -- on uses of
13. force. It helps deescalate things. It
14. definitely -- they are definitely tools of
15. deescalation.
16. Q. Okay. Why doesn't LAPD use its K-9s for
17. apprehension?
18. A. Because we have tools -- we have tools in our
19. toolbox that we don't have to do that.
20. That's my point.
21. Q. Okay. Yeah. I agree with you. Is it your
22. opinion that IMP- -- well, strike that.
23.     What is the next one, "Handlers
24. should be cognizant of the time that their
25. PSD is actively on the bite, minimizing that

Michael Goosby
February 16, 2021

94

time as feasible and appropriate." What's that?
A. That's how -- they should be cognizant of how their police service dog is actively on a bite, minimizing that time as feasible and appropriate. Again, you know, if my dog is in a bite -- to me, a dog biting a suspect is chaos. And I think a suspect is chaos, and I think a dog by themselves could be chaos. Because dogs don't care about tactics, they don't care about officer safety, they don't care about risk. They only care about finding the bad guy because that's what they're trained to do. Again, they don't have the ability to reason and use, you know, cognitive thought, you know, processes.
However, their chaos is separately chaos. They come together, that's more chaos. Well, we need to stop the chaos because chaos does not fix chaos. Someone needs to step in and stop the chaos and take control of the situation.
So what I mean by that is, a dog shouldn't be on a bite for a long time. If the suspects are being -- if a dog is on a

95

bite, then the dog needs to be taken off the bite in a timely manner.
Q. So IMPD needs to improve the timely manner in which they take their dogs out of a bite.
A. Yes, that is correct.
Q. Okay. And the next one down, handlers should make every effort to recall their police service dog off the bite after suspect has been located, okay, and employ conventional tactics when appropriate rather than hard-out as a default. Do you see that?
A. Yes, I do.
Q. Okay. So it's inappropriate that IMPD train their handlers to do the hard-out as a default, correct?
A. No, I didn't say it's inappropriate. I said use conventional tactics when appropriate. Meaning that if the time allows you, the incident allows it, they use conventional tactics. I never said the hard-out is inappropriate. I'm saying that rather than that be your default -- because that goes back up to the bullet point above that -- taking -- minimize the time the dog -- the dog is on a bite.

96

So my point to that is, their hard-out shouldn't be your default. Because if the hard-out is your default, then you're going to take time to take that dog off the bite. What I mean by that is, let me see your hands, don't do this, don't do that. And then you're going to go up and put handcuffs on the suspect, which he's handcuffed first -- you know, people call it cuffing under power, before you take the dog off the bite. Well, now we get into -- we went from a 10- to 15-second bite incident to now a minute to two-minute bite incident, which is a long time.
Q. So hard-outs, as IMPD was employing them, were expanding the amount of time of the literal bite --
A. Yes.
Q. -- is that safe to say?
A. That is safe to say.
Q. Okay. And is it safe to say from your experience, too, Mike, that the longer a dog's biting you, the higher potential that you're going to suffer more severe injuries?
A. Well, yeah. I mean, yeah, I agree with that,

97

yes.
Q. Okay. The K-9 supervisor, in his or her absence, the scene supervisor should be responsible to expressly approve or deny the deployment of a K-9. So let me ask you this: That's the policy at Los Angeles Police Department, correct?
A. That's correct.
Q. And Los Angeles Police Department polices 4.3 million people in a 500-square-mile radius, correct?
A. That's correct.
Q. And has, you said, somewhere between 60 and 70 bites a year, correct?
A. That's correct.
Q. Okay. And you're -- you don't know the number of IMPD bites per year, correct?
A. I do not, sir.
Q. Okay. We are going to look up, just to correct one -- or to get around one of the State's objections, we're going to look up the actual population of Indiana -- of Marion County and our dog bite numbers and come back to you with that before we conclude.
MR. LITTLE: Emma, if you could

25 (Pages 94 to 97)

Fillenwarth Reporting Service
317.345.6179

Michael Goosby
February 16, 2021

**142**

multiple guns. The victim said he had two guns. We were searching for him, and he was hiding. As the dog gets to the yard where the suspect was, the suspect saw the team coming in before the dog got set on him, the suspect jumped up, gun in hand, started running. And the handler didn't send the dog right away because the suspect did have a gun and we didn't need the dog getting shot. When the suspect turned his back and went into a full-blown run, the handler sent the dog. The dog did not get there fast enough because the suspect had taken off sooner than when the dog was sent. And he jumped on top of a fence, and he placed the gun on the roof of a garage right there. He then jumped off the fence into another yard and takes off.

The airship loses him under a bunch of trees, so the team transitions to the other side of the block, starts searching where he was last seen by the airship. And the suspect pops out again and starts running towards a residence, at which time the handler deployed the dog. The suspect did not make it to the front door. He saw the

**143**

dog and tried to hit the fence again, and the dog caught him on the fence.

The dog pulled him off the fence onto the ground, the team moved up to a position of advantage, the handler called the dog back -- that was probably all in about 7 seconds -- called the dog back to his side, and then the search team took over taking the guy into custody.

Q. Verbally called the dog back, right?
A. Yes. We pretty much verbal all the time. That's how we operate.
Q. And you're confident you can recall your dogs verbally, correct?
A. Yeah, we have -- well, I mean -- we do it every night. We do that in training. Yeah, that's what I'm saying, yeah, I'm confident we can do that. Like I said, we train every night. So if there's going to be a problem within training, or a dog problem, I'm going to see it early on and I'm going to catch it before it becomes a -- you know, the proverbial mountain into a molehill, or a molehill to a mountain, whatever you call it. But I would see it early on.

**144**

Q. So let me -- correct me if I'm wrong. An LAPD dog, when it finds a human in a search, barks at the human, correct?
A. Correct.
Q. An IMPD dog, when it finds a human in a search, bites the human, correct?
A. Correct.
Q. Okay.
A. But in their defense, you know, I mean, that's the norm across the country, to be honest with you.
Q. But it's not the norm in Los Angeles, right?
A. No, it's not.
Q. And, you know, I was thinking earlier, you just sold the dog or gave a dog to IMPD, right?
A. Yes.
Q. You didn't take any IMPD dogs, right? You didn't take one back --
A. Well, that dog didn't come from me. That dog came from another department. It came from Glendale Police Department. It didn't come from me. It wasn't my dog.
Q. Oh, okay. About Andrew Scheil, the attorney you spoke with, when did you speak to him, do

**145**

you remember?
A. I spoke to him twice. I spoke to him once today, and I spoke to him once -- he sent me an email. I can't remember the date. Let me see if it's on here. I can't remember the date. Let me see if the email is still there. He sent me an email -- what's his name again, Scheil?
Q. Andrew, yep.
A. Andrew Scheil? Andrew Scheil. Hold on. That's not it. Hold on one second. I don't see the -- okay, so January 10th was when I got the email. And --
Q. From him to you?
A. No, he sent me the email on the 10th, and then he asked me could he give me a call on Tuesday sometime to discuss. And I said yes. So I'm assuming he called me that following Tuesday following the 10th. That's my assumption.
Q. Okay. So the Tuesday following the 10th would have been the 12th?
A. Yes.
Q. And how long did you talk to him for?
A. I don't remember. Probably about -- maybe

37 (Pages 142 to 145)

Michael Goosby
February 16, 2021

**146**

1    10 minutes at the most.  They weren't long
2    conversations, I can tell you that.
3    Q.  But he initiated contact with you and
4    scheduled a time to talk to you, and you guys
5    talked on January 12th.
6    A.  That's correct.
7    Q.  And what did you guys talk about today?
8    A.  He asked some questions regarding -- like I
9    mentioned earlier, he had some questions
10   regarding the hard-out.  And he asked me that
11   did I think that -- if they had the
12   hard-out -- if they try to verbal-out and
13   then the hard-out, would I find that
14   acceptable.  And I said, yeah, absolutely,
15   because you have -- the dog has to want to
16   bite, so -- and that was probably a
17   five-minute conversation.
18   Q.  But LAPD dogs are called off the bites,
19   right?
20   A.  They are, but we have had situations where we
21   have to hard-out.
22   Q.  Okay.
23   A.  There's no doubt.  But it's not because the
24   dog won't return to us, it's because the
25   circumstances and incident dictate that.  For

**147**

1    example --
2    Q.  Okay.  Tell me about the circumstances --
3    A.  Go ahead, I'm sorry.
4    Q.  Tell me about the circumstances that dictate
5    a hard-out in LA.
6    A.  Well, we had one where a suspect was hiding
7    underneath -- a shooting suspect just shot
8    two people in south LA, and two suspects, as
9    a matter of fact.  We found one first.  He
10   was hiding under a truck that was big
11   stake-bed truck, but it had no tires on it,
12   no wheels or tires.  So the truck was very
13   low to the ground, and there was a lot of
14   debris -- it was like a junkyard he was in
15   and he was underneath the truck.  A dog found
16   him underneath the truck, and as the dog came
17   in, he said, for his statement, the dog
18   started kinda barking at him, he tried to
19   move away from the dog, the dog bit him, he
20   reached down and grabbed the dog, he hooked
21   the dog's collar and tried to pull him off.
22   And he couldn't get him off, so he put the
23   dog in the headlock to try to hold him there
24   so the dog could not get any more bite on
25   him.

**148**

1    We recalled the dog a few times, and
2    the dog didn't come back.  One of the search
3    team members flashed their light underneath
4    the truck and could see the suspect below the
5    truck.  They were like, "Hey, let go of the
6    dog, let go of the dog, let go of the dog."
7    He said, "I can't, I can't, I can't, he's
8    biting me.  I can't, he's biting me."
9        So the idea was then to go ahead and
10   we're going to use another form of less
11   lethal, we're going to tase him.  He got
12   tased.  The first time the taser darts hit
13   him, he let go, and then he pulled the dart
14   out and the dog -- he pulled the dart out
15   like really quick.  I mean, I'd say he let go
16   of the dog maybe two seconds, and he
17   reacquired his grip with one hand and pulled
18   the dog off.  They tried to do a dry stun,
19   didn't work, so the handler and point officer
20   were underneath there, the handler grabs hold
21   of the dog --
22   Q.  Wait, are they tasing the dog or the guy?
23   A.  The guy.  Not the dog.  The guy.  But you can
24   tase a suspect when the dog's on a bite and
25   it's not going to be effective.  He grabs

**149**

1    hold of the dog, tells the suspect "I have
2    the dog," and, "Let him go, let him go."  The
3    suspect lets him go, the handler tells the
4    dog to release, he hard-out to him, and
5    pulled him out of there.
6    Q.  Okay.  But that was the suspect fighting the
7    dog, right?
8    A.  Yes.
9    Q.  Okay.  What about when it's an 80-year-old
10   man, or an elderly person or whatever, not
11   fighting the dog, should the dog always be
12   able to be recalled?
13       MS. BOWLING:  Objection.
14     Go ahead, Sergeant.
15   A.  I would say, yes, they should be able to be
16   recalled.  But again, if the dog is trained
17   to be recalled, though.  If the dog is not
18   trained to be recalled -- you know, there are
19   some departments, a lot of departments whose
20   policy is to hard-out.  Make no mistake, it's
21   not a bad thing.  The LA County Sheriff, the
22   largest sheriff's department in the country,
23   they hard-out their dogs.  The LA County
24   Sheriff's, the largest sheriff department in
25   the country, they do find and bite.  So it's

Fillenwarth Reporting Service
317.345.6179