UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GORDON MITCHUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-02277-DLP-JPH |
| | ) | |
| CITY OF INDIANAPOLIS, | ) | |
| INDIANAPOLIS METROPOLITAN | ) | |
| POLICE DEPARTMENT (IMPD), | ) | |
| BRYAN ROACH, | ) | |
| MOLLY GROCE, | ) | |
| DOES 1-50, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This matter comes before the Court on the Defendants' Motion for Summary

Judgment, Dkt. [78]. For the reasons set forth below, the Court **GRANTS IN PART**

and **DENIES IN PART** Defendants' motion.

## I.    Background

On May 31, 2018, Plaintiff Gordon Mitchum ("Mr. Mitchum") was sitting

with his wife on their back porch located at 3231 N. Gladstone Avenue in

Indianapolis, Indiana. (Pl. Compl., Dkt. 1 at 3; Mitchum Dep. 16:4-8, 21-24, Dkt. 88-

1 at 3). Indianapolis Metropolitan Police Department ("IMPD") officers were in Mr.

Mitchum's neighborhood searching for two carjacking suspects. (CAD Audio, Dkt.

84-5). A canine officer was requested, and K9 Officer Molly Groce responded to the

call with her police dog, Obi. (CAD Audio, Dkt. 84-5). By the time Officer Groce

arrived on scene, several IMPD officers had already apprehended the first

carjacking suspect and had him sitting handcuffed in the yard of 3229 N. Gladstone Avenue. (CAD Audio, Dkt. 84-5; Mitchum Dep. 13:14-14:6, Dkt. 88-1 at 3).

Officer Groce consulted with several IMPD Officers on the scene, and Officer Robinson informed her that it did not appear that either suspect was carrying a firearm or weapon of any kind. (Blue Team Report – Groce, Dkt. 79-9 at 7). Officer Groce confirmed that three verified witnesses had not observed a weapon on either suspect. (Id.). Officer Groce asked three IMPD Officers to back up her intended track with K9 Obi, and informed them that K9 Obi was not social and needed space while tracking. (Id.). Officer Groce drove over to 3200 N. Colorado Avenue to begin the track, at which point she gave verbal announcements of her intention to use a police K9. (Blue Team Report – Groce, Dkt. 79-9 at 7; Groce Dep. 34:10-19, Dkt. 79-2 at 10). Officer Groce, K9 Obi, and the three backup Officers searched the backyard, woodline, and brush of 3223, 3225, and 3229 N. Gladstone, at which point K9 Obi began backtracking to the site where the first suspect was handcuffed in the grass of 3229 N. Gladstone. (Blue Team Report – Groce, Dkt. 79-9 at 7-8). K9 Obi began pulling toward the first suspect and barking at him. (Id. at 8). Officer Groce then switched K9 Obi from a tracking command to an area search by giving him the command "Zuch[1]." (Blue Team Report – Groce, Dkt. 79-9 at 8; Groce Dep. 37:16-23, Dkt. 79-2 at 10).

---

[1] Throughout the record, the command for IMPD dogs to search an area is spelled "such" or "zuch." The Undersigned has adopted Sergeant Patton's spelling from his 2019 deposition testimony. (Patton 2019 Dep. 18:10-13; Dkt. 79-3 at 18).

Officer Groce had K9 Obi on a 6-foot lead and allowed him to walk ahead of her as they entered the side yard of Plaintiff's residence at 3231 N. Gladstone. (Blue Team Report – Groce, Dkt. 79-9 at 7-8). It is disputed whether Officer Groce gave a verbal announcement of her and the K9's presence before entering Mr. Mitchum's backyard. (Dkt. 89 at 25 n.11, 30). Her contemporaneous account in the Blue Team Report does not reflect any announcement, (Blue Team Report – Groce, Dkt. 79-9 at 8), but Officer Groce's deposition testimony states that an announcement was made. (Groce Dep. 40:1-6, Dkt. 79-2 at 11). K9 Obi then began to turn the corner onto Mr. Mitchum's back patio, at which point he engaged Mr. Mitchum and bit his left calf and right foot. (Mitchum Dep. 18:7-20; Dkt. 88-1 at 4).

It is disputed how K9 Obi came to release Mr. Mitchum's leg. Officer Groce testified in her deposition that she gave a verbal command and used the electronic collar to release K9 Obi, (Groce Dep. 43:10-44:14; Dkt. 79-2 at 12), while in her Blue Team Report she stated that she put both hands on K9 Obi's choke collar while giving a verbal command. (Blue Team Report – Groce, Dkt. 79-9 at 8). Mr. Mitchum, however, testified that Officer Groce gave no verbal command and had to pull K9 Obi off of his leg, the force of which was strong enough to pull him out of the chair in which he was sitting. (Mitchum Dep. 20:19-21:4, 21:14-20; Dkt. 88-1 at 4-5). Officer Robinson also testified that he saw Officer Groce pull K9 Obi "off strong," meaning to lift Obi by his collar. (Robinson Dep. 9:14-17; Dkt. 79-7 at 3). Once Obi released Mr. Mitchum's left calf, he immediately reengaged and bit Mr. Mitchum's right foot. (Mitchum Dep. 18:7-20; Dkt. 88-1 at 4). Mr. Mitchum suffered bite

wounds that required several months of treatment. (Mitchum Dep. 21:10-13, 32:1-10; Dkt. 88-1 at 5, 7).

IMPD Officer Borgeman, one of the first officers on scene, had been aware of Mr. Mitchum's presence prior to the biting incident because he had spoken with Mr. Mitchum after apprehending the first suspect. (Blue Team Report – Hedden, Dkt. 79-9 at 10-11). Officer Borgeman did not tell the K9 search team that there were people on the back porch of 3231 N. Gladstone. (Id.). Sergeant Patton testified that if IMPD officers see any civilians in a potential K9 search area, they will warn the civilians to go inside the house or go somewhere outside of the search area to ensure their safety. (Patton 2019 Dep. 17:13-25; Dkt. 79-3 at 17). Sergeant Hedden concluded that this bite was preventable, due to Officer Groce's failure to shorten K9 Obi's leash before rounding an unknown corner or having her back-up Officers clear the corner. (Blue Team Report – Hedden, Dkt. 79-9 at 11). Additionally, Sergeant Hedden concluded that lack of communication between Officer Borgeman and the K9 search team was a contributing factor to the preventable bite. (Id.). Sergeant Patton concluded that this bite was preventable because Officer Groce failed to visually observe the corner she was negotiating. (Blue Team Report – Patton, Dkt. 79-9 at 12). Sergeant Patton also found that officer safety was not an issue here; instead, the issue was how the handler (Officer Groce) approached the unknown corner. (Id.).

## II.   Legal Standard

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing the absence of genuine issues of material fact. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). If the moving party carries its burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley,* 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

## III. Discussion

The Defendants filed their Motion for Summary Judgment on November 16, 2020, arguing each claim asserted by the Plaintiff in his Complaint fails as a matter of law. (Dkt. 81). Specifically, Defendants contend that (1) Plaintiff was not seized under the Fourth Amendment; (2) the conduct at issue here does not satisfy the shock-the-conscience standard under the Fourteenth Amendment; (3) Officer Groce and Chief Roach[2] are entitled to qualified immunity for claims asserted against them in their individual capacity; (4) Plaintiff's *Monell* claim fails for failure to demonstrate that any policy of the IMPD caused his injuries; and (5) Plaintiff's negligence claims fail because IMPD is immune from suit under the Indiana Tort Claims Act and Officer Groce is not the proper Defendant. (Id.). Plaintiff filed his response on December 14, 2020, asserting that there is a genuine issue of material fact as to each of Defendants' contentions that precludes this Court from granting summary judgment. (Dkt. 89 at 3.) The Defendants filed their reply on January 11, 2021. (Dkt. 97).

### A. IMPD is not entitled to summary judgment on Mr. Mitchum's Section 1983 Fourth Amendment claims because genuine issues of material fact preclude a finding of reasonable force.

To state a claim under 42 U.S.C. § 1983, Mr. Mitchum must present facts sufficient to show that the Defendants, acting under color of state law, deprived him of a specific right or interest secured by the Constitution or laws of the United

---

[2] Defendants request that this Court substitute the new IMPD Chief Randal Taylor for the named Defendant Bryan Roach, the previous IMPD Chief, pursuant to Federal Rule of Civil Procedure 25(d). (Dkt. 81 at 1). The Court grants that request as to the official capacity claim against the IMPD Chief, but denies the request as to the individual capacity claim against Bryan Roach. The parties are directed to file a motion to name the proper Defendants on or before July 23, 2021.

States. *See* 42 U.S.C. § 1983 (2003); *Payne v. Churchich*, 161 F.3d 1030, 1039 (7th Cir. 1998). Section 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced. *See Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Those specific rights in turn provide "'the appropriate analytical lens through which facts are to be viewed,'" directing the Court to the proper doctrinal framework in which to address the claims. *Bublitz v. Cottey*, 327 F.3d 485, 488 (7th Cir. 2003) (citing *Payne*, 161 F.3d at 1039)). In this case, Mr. Mitchum has alleged that his rights under the Fourth and Fourteenth Amendments were violated. The Court will address each argument in turn.

The Fourth Amendment provides the right to be secure against unreasonable searches and seizures. *See* U.S. Const. amend. IV. The Supreme Court has stated that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original).

Defendants argue that Plaintiff's Fourth Amendment claim for excessive and unreasonable force when seizing Mr. Mitchum cannot prevail because none of the Defendants intended for K9 Obi to seize Mr. Mitchum. (Dkt. 81 at 5-12). Plaintiff

maintains that the Defendants and K9 Obi seized the object of their intent – a human in the requested search area, which happened to be Mr. Mitchum – and that this seizure was unreasonable and the result of excessive force because Officer Groce allowed her K9, trained to bite and hold the first person he encounters, to enter his backyard without probable cause. (Dkt. 89 at 19). The Court must first address whether a Fourth Amendment seizure occurred.

     *i. Seizure*

The parties' only dispute with respect to whether a seizure occurred rests on the interpretation of the last phrase in the Supreme Court's *Brower* quotation, "through means intentionally applied." Defendants claim that they did not release K9 Obi with the intent of seizing Mr. Mitchum and, therefore, no seizure could have occurred because the instrumentality was not directed at Mr. Mitchum. (Dkt. 81 at 12). By contrast, Plaintiff maintains that K9 Obi was instructed to search the Plaintiff's neighborhood for a human being and ultimately found such a human. Thus, Mr. Mitchum contends, he was the object of the Defendants' intent because he was the first human being to be found in the search area. (Dkt. 89 at 18-19).

"Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking must itself be willful." *Brower*, 489 US at 596. Thus, accidental or unintended consequences of otherwise lawful government conduct do not rise to the level of a Fourth Amendment violation. *Id.* Defendants claim that no seizure occurred here because there was no willful intent to seize Mr. Mitchum and cite to several cases in support of that

proposition. *Bublitz v. Cottey*, 327 F.3d 485 (7th Cir. 2003) (no intent to seize bystanders where officer deployed tire-deflation system to stop fleeing suspect's vehicle, causing fatalities); *Bean v. Indiana Univ.*, 855 F. Supp. 2d 857, 864-65 (S.D. Ind. 2012) (no intent to seize bystander where officer chasing fleeing suspect collided with bystander and caused injuries); *Warfield v. City of Chicago*, 565 F. Supp. 2d 948 (N.D. Ill 2008) (no intent to seize bystander when officers shot at suspect as he entered an apartment building); *Brandon v. Village of Maywood*, 157 F. Supp. 2d 917, 925 (N.D. Ill 2001) (no intent to seize bystander when officers shot at advancing dog in neighboring yard). Defendants also cite to several cases from other Courts of Appeal outside of the Seventh Circuit. (Dkt. 81 at 8-9).

Those cases are all distinguishable from the facts at hand. The cases cited by Defendants typically involved an innocent bystander who got in the way of the police officers who were actively apprehending a suspect. There, the force in question (the officer's body, canine, gun, or tire-deflation system) had a suspect in mind and in sight; here, however, while the Defendants claim that the purpose of the search in Plaintiff's neighborhood was to find a carjacking suspect, the limited facts presented thus far suggest that Obi was released to find a human, any human, in the area. First, Obi was given no scent to follow and it is unclear whether the officers knew if the second suspect was still in the Plaintiff's neighborhood as it is disputed whether a perimeter had been set up. When Obi was first released, he backtracked to the first suspect who was sitting in handcuffs by the street in front of Mr. Mitchum's house, which suggests that this is the scent that Obi was targeting and pursuing. Next, K9 Obi was redirected to conduct an area search with

the command "Zuch." As noted above, Obi's training when given the command "Zuch" was to locate a human being and engage that human being, and it appears Obi performed according to his training. (Blue Team Report – Groce, Dkt. 79-9 at 8; Groce Dep. 20:13-21:2, 21:15-22:9, 34:20-36:4; Dkt. 79-2 at 6-7). Therefore, at this point in the search, the object of the force is no longer an identified subject, but that of any human being. Mr. Mitchum's freedom to leave was eventually terminated by Officer Groce's intentional deployment of Obi to "Zuch" in the area of Mr. Mitchum's backyard.

Defendants next cite to cases that address the issue of transferred intent in the case of a police canine biting an innocent bystander rather than an intended suspect. (Dkt. 81 at 9-12). These cases are also distinguishable. In *Gangstee v. Cty. Of Sacramento*, No. S-10-1004 KJM GGH, 2012 WL 112650 (E.D. Cal. Jan. 12, 2012), a police canine, who was not leashed, ran away from his handler to bite an innocent bystander who was running to her young child. The police canine was not given a command to search the area for humans; in fact, the canine was under no command and ran away from his handler of his own will. *Id*. In this case, however, IMPD's K9 Obi was given a command to search the area for any human being and ultimately found a human being. Thus, the object of Officer Groce's command was a human, while in *Gangstee*, the K9 had not received any command and the bite was clearly accidental. In *Peterson v. City of Fed. Way*, No. C06-0036 RSM, 2007 WL 2110336, at *1 (W.D. Wash. July 18, 2007), a police canine was actively tracking a suspect through an apartment complex and nearby parking lot. The police canine actively followed the scent of the suspect but encountered the innocent bystander

about 25 feet from the suspect's hiding place; the bystander screamed at the sight of the canine and was then bitten. *Id.* at *1-2. The facts of this case are similarly distinguishable. Unlike *Peterson*, K9 Obi did not have an active scent of a suspect and was not tracking any particular person in the search area. In *Peterson*, the police canine was directed to locate an identified suspect, while here, K9 Obi was directed to locate any human. Finally, in *Hansen v. City of St. Paul*, No. 06-1286 (DSD/SRN), 2007 WL 4224052, at *1 (D. Minn. Nov. 27, 2007), a police officer and his canine were chasing after a suspect who had climbed over a fence into the bystander's yard. The bystander confronted the suspect and grabbed him, trying to push him out of her yard, at which point the canine ran up and bit the bystander instead of the suspect. *Id.* In the present case, there was no suspect being actively tracked or apprehended and there was no confusion for the canine as to which individual was proper to engage. The Court agrees with the Plaintiff that this is not a case of transferred intent. K9 Obi's command was to search the area for a human being, and K9 Obi completed his search by finding and biting Mr. Mitchum.

Defendants also rely heavily on this Court's decision in *Mancini v. City of Indianapolis*, No. 1:16-cv-2048-TWP-MJD, 2018 WL 4680188 (S.D. Ind. Sept. 28, 2018) throughout their brief – that case, too, is distinguishable. (Dkt. 97). In *Mancini*, K9 Scooter was actively chasing the intended suspect through the plaintiff's neighborhood, and when the plaintiff stepped outside to investigate why her dogs were suddenly barking, she stepped into K9 Scooter's pathway to the suspect. 2018 WL 4680188, at *2. Here, however, Obi had no scent and there is no evidence that Obi was "locked on" to the second carjacking suspect. Unlike in

*Mancini,* there is evidence before this Court suggesting that IMPD's canines are trained to bite and hold any human when given the command "Zuch," K9 Obi was to find a human being and apprehend that individual, and Obi succeeded here.

It is prudent to look to the Supreme Court's explanation in *Brower* when analyzing whether there was an unconstitutional seizure: "[i]n determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line . . . . We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U.S. at 598–99. In this case, K9 Obi was the instrumentality that was set in motion to search the neighborhood and find a human being; K9 Obi found a human being; and Mr. Mitchum was that human being. As such, taking the facts in the light most favorable to the Plaintiff, one could find that Mr. Mitchum was seized under the Fourth Amendment.

## ii. *Reasonableness*

As discussed previously, the Fourth Amendment only protects against *unreasonable* searches and seizures. Thus, the central question presented in Mr. Mitchum's Fourth Amendment excessive force claim is whether the force used in seizing Mr. Mitchum was objectively reasonable. "A claim that an officer employed excessive force in arresting a person is evaluated under the Fourth Amendment's objective-reasonableness standard." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). "In judging whether the government's actions were reasonable, courts must balance the risks of bodily harm in apprehending a fleeing suspect that the government's actions pose in light of the threat to the public that the

government is trying to eliminate." *Mancini v. City of Indianapolis*, No. 1:16-cv-02048-TWP-MJD, 2017 WL 4250112, at *5 (S.D. Ind. Sept. 26, 2017) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

In weighing this balance, the Court considers, among other things, (a) the severity of the crime at issue, (b) whether the suspect posed an immediate threat to the safety of others, and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Where the use of force in question is the use of a police dog, courts often weigh four additional factors: (d) whether the officer warned the subject that he would deploy the dog; (e) the degree of control the officer maintained over the dog; (f) whether the officer terminated the dog bite within a reasonable amount of time; and (g) whether alternative tactics reasonably were available. *Becker v. City of Evansville*, No. 3:12-cv-182-WGH-TWP, 2015 WL 328895, at *6 (S.D. Ind. Jan. 26, 2015), *aff'd and remanded sub nom. Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016) (collecting cases).

While giving some deference to an officer's perceptions and judgments, the Court's inquiry of the reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) ("[T]he dispositive question is whether, in light of the facts and circumstances that confronted the officer . . . [did] the officer behave[] in an objectively reasonable manner.").

As detailed below, the evidence before the Court on the City's motion for summary judgment is insufficient to allow the fact intensive Fourth Amendment analysis required by *Graham v. Connor*. In their briefing, the Defendants do not present any argument that the force used to seize Mr. Mitchum was reasonable, presumably because they assumed this Court would conclude that no seizure occurred. Plaintiff, however, lists several disputed facts that he contends demonstrate the unreasonableness of the seizure. The Court will now analyze those facts.

In this case, a carjacking was reported, and the victim's vehicle had been located at 33rd Street and Forest Manor Avenue in the Plaintiff's neighborhood. (Blue Team Report – Groce, Dkt. 79-9 at 6). The first suspect had been apprehended near 3229 N. Gladstone, but the second suspect had not been located. (Id.). Officer Groce proceeded toward the apprehension site of the first suspect, and saw that individual detained in handcuffs with 4-5 IMPD officers on site. (Id.). It is disputed whether a perimeter was established, as will be discussed in detail later.

Officer Groce next questioned Officer Montgomery about whether either carjacking suspect was armed. (Blue Team Report – Groce, Dkt. 79-9 at 6). Officer Montgomery conveyed that he had not seen either individual carrying a weapon, that no firearm was located in the victim's vehicle, and that the victim had not observed a firearm on the suspects. In addition, a neighborhood witness stated that he also had not observed a firearm. (Id. at 6-7). Officer Robinson confirmed that the last observed location of the second subject was 3200 N. Colorado, and that it did not appear either suspect had a firearm or any weapon. (Id.). Because Officer Groce

did not believe the second suspect to be armed and three verified witnesses had not observed a weapon, she chose three non-K9 officers as her backup for the planned track of the second suspect with K9 Obi. (Id. at 7).

Officer Groce made several loud, verbal announcements at 3200 N. Colorado of her intent to use a K9 to search the area, Obi was then deployed, and Obi immediately began tracking a scent. (Id.). This scent brought the K9 back toward the first subject who was still detained at 3229 N. Gladstone. (Id.). Because that track failed, Officer Groce redirected Obi away from the first subject and gave him the command "Zuch," to direct him to search the area for a human being. (Id. at 7-8). A backup officer opened the fence gate to 3231 N. Gladstone, Mr. Mitchum's residence, and Officer Groce and K9 Obi proceeded along the side of Mr. Mitchum's home. (Id. at 8). K9 Obi began pulling Officer Groce southbound, Obi rounded the corner of Mr. Mitchum's back patio ahead of Officer Groce, and Obi immediately engaged with Mr. Mitchum by biting his left calf. (Id.).

There are several disputed material facts regarding the course of events on May 31, 2018. First, it is disputed whether a perimeter was established after the suspects fled the carjacking victim's vehicle. During the Computer-Assisted Dispatch (CAD), Officer Groce announced that no perimeter had been set up. (CAD Audio 6:58-7:05, Dkt. 84-5). In her contemporaneous Blue Team Report statement, Officer Groce wrote that when she arrived on scene, she saw no vehicles in a perimeter and that the first officer she spoke to advised her that he was unsure if a perimeter had been established. (Blue Team Report – Groce, Dkt. 79-9 at 6). In addition, Officer Montgomery, who was the officer who initiated the traffic stop of

the carjacking victim's vehicle, testified in his deposition that no perimeter was set up because the events happened too quickly. (Montgomery Dep. 7:7-10, Dkt. 79-6 at 3). During her deposition, however, Officer Groce testified that a perimeter was set up. (Groce Dep. 33:18-19, Dkt. 79-2 at 9). Taking the facts in the light most favorable to Mr. Mitchum, the Court assumes that no perimeter was established.

Next, while it is not disputed that Officer Groce made a verbal announcement at the start of the search at 3200 N. Colorado, it is disputed whether Officer Groce made a verbal announcement upon entering Mr. Mitchum's backyard approximately .2 miles away. (Dkt. 89 at 25 n.11; 30). Officer Groce's contemporaneous account in the Blue Team Report does not reflect any such announcement, (Blue Team Report – Groce, Dkt. 79-9 at 8), but Officer Groce's deposition testimony states that an announcement was made. (Groce Dep. 40:1-6; Dkt. 79-2 at 11). Taking the facts in the light most favorable to Mr. Mitchum, the Court assumes that no announcement was made upon entering Mr. Mitchum's backyard.[3]

Next, there remains a question of fact as to whether Officer Groce gave a verbal command to K9 Obi to compel him to release Mr. Mitchum's leg before using the "choke off" method. Officer Groce wrote in her Blue Team Report and testified in her deposition that she gave a verbal command to Obi, (Blue Team Report – Groce, Dkt. 79-9 at 8; Groce Dep. 40:17-19, Dkt. 79-2 at 12), while Mr. Mitchum testified

---

[3] A number of courts have found that by conducting a search with a police dog trained to bite the first person he sees without giving a warning may constitute excessive force. *See, Brown v. Whitman*, 651 F.Supp.2d 1216, 1226 (D. Colo. 2009) (collecting cases).

that he waited for Officer Groce to call off K9 Obi but she never gave a verbal command. (Mitchum Dep. 21:14-20; Dkt. 88-1 at 5). Officer Groce wrote that Mr. Mitchum had slid down in his chair and was kicking his foot out to get Obi away from him, (Blue Team Report – Groce, Dkt. 79-9 at 8); Mr. Mitchum testified that Officer Groce pulled on K9 Obi's collar so hard that it forced him out of the chair in which he was sitting. (Mitchum Dep. 20:19-21:4; Dkt. 88-1 at 4-5). Sergeant Patton indicated that Officer Groce initially tried to pull Obi "off strong" and when he did not immediately respond she used her electronic collar remote to shock Obi. (Patton 2019 Dep. 75:11-17; Dkt. 79-3 at 75). Sergeant Patton testified that IMPD trains its officers to "pull off strong," or grab the dog forcefully by the collar and pick them up and out of the bite so that they do not have to wait for the dog to respond to a verbal command. (Patton 2019 Dep. 77:8-17; Dkt. 79-3 at 77). Taking the facts in the light most favorable to Mr. Mitchum, the Court assumes that no verbal command was given to Obi and that Officer Groce's first action was to grab Obi's collar in an attempt to pull him "off strong."

Even if the Court were to accept Officer Groce's testimony that she gave Obi a verbal command to release the bite on Mr. Mitchum, the evidence would show that Obi did not respond to two different verbal commands. (Groce Dep. 43:17-44:10, Dkt. 79-2 at 12). At her deposition, Officer Groce testified that K9 handlers should always have control over their dogs, including the ability to recall the dog at any time, even out of a bite. (Groce Dep. 66:17-25, Dkt. 79-2 at 18). In both his deposition for the *Mancini* case and for this case, Sergeant Patton also testified that K9 handlers should be able to verbally recall their dogs from a bite and the dogs

should be able to release from a bite on the verbal command of their handlers, and IMPD K9s are tested and trained on the ability to be recalled. (Patton 2019 Dep. 37:20-38:1, Dkt. 79-3 at 37-38; Patton 2017 Dep. 24:17-25:9, Dkt. 88-15 at 4-5). According to Plaintiff's expert, Detector Dogs International consultant Kyle Heyen, the facts as presented by Officer Groce could demonstrate either that Officer Groce or K9 Obi was not properly trained on verbal commands. (Heyen Report, Dkt. 88-4 at 10).

Finally, it is disputed whether Officer Groce and K9 Obi were properly or consistently trained. Tim Hartsock, Mr. Mitchum's expert in dog training, stated in his report that Obi's training records do not show that he was ever trained on a track longer than 150 yards or trained on a track with any age to it. (Hartsock Report, Dkt. 88-7 at 9). Obi's records showed that he was evaluated on 3 tracks from 2016-2019, which would not, according to Mr. Hartsock, indicate that there was sufficient training or evaluation as to Obi's ability to track a subject. (Id.). Mr. Heyen's expert report noted that the recommended industry standard is for each patrol dog team to receive approximately 204 hours per year of apprehension training; Obi's records showed a three-year total of approximately 76 hours of apprehension training. (Heyen Report, Dkt. 88-4 at 20). Moreover, no records were provided regarding the performance results of Obi's trainings. (Id.). Furthermore, the Defendants have failed to present any records of Officer Groce's attendance at trainings. *Id*. As such, one could conclude that a lack of evidence as to training means that Officer Groce or Obi were inadequately trained.

One could also conclude that it was unreasonable for Officer Groce to grab Obi's collar and "pull off strong" before attempting verbal commands. Mr. Heyen indicated in his report that pulling off strong creates a stronger drive for and lengthens the duration of the bite. (Heyen Report, Dkt. 88-4 at 11). Sergeant Patton testified that he trains his K9 officers to use the "pull off strong" method so that the officer does not have to wait for the dog to respond to a verbal command, (Patton 2019 Dep. 77:8-17; Dkt. 79-3 at 77); but by implementing this training, Sergeant Patton in effect teaches his officers and his dogs to increase the intensity and duration of any bites, intentional or accidental. Mr. Heyen stated that industry standard provides that a dog who does not disengage or release from a bite with verbal commands will fail certification. (Heyen Report, Dkt. 88-4 at 26). With this evidence, one could conclude that this IMPD training, and Officer Groce's use of that training, was unreasonable under the circumstances.

As it stands, no perimeter was established in Plaintiff's neighborhood, so it was unknown whether the second suspect was still in the area. Sergeant Patton testified that his IMPD officers are supposed to set up a perimeter in order to contain a potential suspect within that perimeter. (Patton 2019 Dep. 14:21-24, 15:18-16:1, 38:12-19; Dkt. 79-3 at 14-16, 38). At least one IMPD officer had previously encountered Mr. Mitchum and knew him to be in his backyard at 3231 N. Gladstone. (Blue Team Report – Hedden; Dkt. 79-9 at 10-11). Nevertheless, upon opening the fence and entering Mr. Mitchum's backyard, Officer Groce did not provide any type of verbal announcement. According to Officer Groce's testimony, if she is entering a new section of an area search, such as going from the first floor to

19

the second floor of a building or entering a fenced-in yard she has not been in before, she would typically give an announcement if the situation was safe. (Groce Dep. 18:16-19:9, Dkt. 79-2 at 6). The district officers on scene, the witness who saw the second suspect, and Officer Groce all agreed that the second suspect was unarmed, and Sergeant Patton agreed that officer safety was not a concern when entering Mr. Mitchum's backyard. (Blue Team Report – Groce, Dkt. 79-9 at 6-7; Blue Team Report – Patton; Dkt. 79-9 at 12). As such, one could conclude that it was unreasonable for Officer Groce not to provide a verbal announcement of her intent to enter Mr. Mitchum's yard with a K9.

Additionally, both Sergeant Patton and Sergeant Hedden fault Officer Groce for her actions after K9 Obi began pulling her in Mr. Mitchum's backyard. Both Sergeants indicate that it was tactically unsound and contrary to policy for Officer Groce to permit her K9 to round an unknown corner without first securing a visual, and that Obi's engagement with Mr. Mitchum could have been prevented if Officer Groce had "sliced the pie." (Blue Team Report – Hedden; Dkt. 79-9 at 11; Blue Team Report – Patton; Dkt. 79-9 at 12). Mr. Heyen, Plaintiff's expert, agrees, stating that "a well-trained handler could have 'sliced the pie' and then verbally controlled the situation or had the backup officers move tactically to control the situation." (Heyen Report, Dkt. 88-4 at 9). Sergeant Patton testified, however, that at some point after biting Mr. Mitchum Obi was reassigned to a different handler because Officer Groce

was afraid that Obi would accidentally bite another person[4] and that fear impacted her handling. (Patton 2019 Dep. 78:24-79:20; Dkt. 79-3 at 78-79).

K9 Obi had a history of accidental bites before biting Mr. Mitchum. K9 Obi bit Officer Groce's 16-year-old female neighbor while not under any command, and bit another IMPD officer while not under any command. (IndyStar Article, Dkt. 88-10 at 11; Hedden Dep. 29:18-30:24, Dkt. 79-5 at 8-9). After biting Mr. Mitchum, Obi then went on to bite Officer Groce. (IndyStar Article, Dkt. 88-10 at 13). Obi was then reassigned to Sergeant Fagan, and went on to bite another IMPD officer. (Id. at 14-15). Additionally, the IndyStar found records attributing at least three bites of *police officers* to Obi in a 4.5 year period. (Id. at 4). Plaintiff's second expert, Tim Hartsock, concluded in his report that Obi was demonstrating a pattern of biting that got predictably and progressively more frequent and more aggressive, from the small scratch on the 16-year-old neighbor to a severe bite of Mr. Mitchum. (Hartsock Report, Dkt. 88-7 at 3). Mr. Hartsock indicated that dogs who demonstrate a pattern of biting should be given immediate evaluation and corrective action. (Id.). Moreover, Mr. Hartsock notes, Officer Groce was aware of Obi's behavior, because she told her backup officers at the scene on May 31, 2018 that Obi was "not social[5]" and posted on her IMPD-approved Instagram account that Obi showed aggression. (Id. at 4). One could conclude that Officer Groce and IMPD knew of Obi's predisposition to accidental bites, yet did nothing to correct

---

[4] After biting Mr. Mitchum, Obi bit Officer Groce later in the year, and Lieutenant Stradling opined that Obi's reassignment was due to Officer Groce being too small of build to handle K9 Obi. (Stradling Dep. 10:3-10; Dkt. 79-8 at 4; IndyStar Article, Dkt. 88-10 at 13).
[5] In Mr. Hartsock's experience, K9 handlers use the phrase "not social" as a code that the K9 is a bite risk. (Hartsock Report, Dkt. 88-7 at 6).

that behavior, and that corrective action could possibly have prevented the accidental bite to Mr. Mitchum.

As noted before, Defendants present no argument to the Court that the seizure of Mr. Mitchum was reasonable; Plaintiff, however, presented several disputed material facts that he argues support a finding that the Defendants' use of force in this case was unreasonable. The evidence before the Court on the Defendants' motion on Mr. Mitchum's Section 1983 Fourth Amendment excessive force claim does not extinguish all genuine issues of material fact as to whether a constitutional violation occurred. Rather, in reviewing the facts in the light most favorable to the Plaintiff, one could reasonably find the seizure of Mr. Mitchum to be unreasonable. As such, Defendants are not entitled to summary judgment as to Mr. Mitchum's Fourth Amendment claims.

### B. IMPD is entitled to summary judgment on Mr. Mitchum's Fourteenth Amendment claim because Defendant's conduct did not shock the conscience.

The Seventh Circuit has stated for over sixty years that the cognizable level of executive abuse of power is that which shocks the conscience. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The "conscience-shocking" standard with its intent requirement is the correct standard for police chases—on foot or otherwise—under the Fourteenth Amendment. *See, e.g., Lewis*, 523 U.S. at 853-54. Substantive due process claims are available only where a defendant engages in "'deliberate action intended to harm another" that is "unjustifiable by any government interest.'" *Steen*, 486 F.3d

at 1022 (quoting *Lewis*, 523 U.S. at 846. A purpose to cause harm is an indispensable condition for imposing Fourteenth Amendment liability. *Id.* at 1023.

It is undisputed that Mr. Mitchum was not a suspect in this case, and that IMPD did not intentionally set out to cause deliberate harm to him. The Defendants had a legitimate government interest to deploy Officer Groce and K9 Obi into Plaintiff's neighborhood, namely to search for a carjacking suspect who previously led an IMPD officer on a police chase. The Court has concerns about the various disputed facts in this case, especially related to training and following procedure, but even the facts taken in the light most favorable to Mr. Mitchum do not rise to the level of conscience-shocking. Accordingly, Plaintiff's Fourteenth Amendment claim is dismissed with prejudice.

## C. The Defendants are not entitled to summary judgment on qualified immunity grounds due to material fact disputes that preclude the Court from weighing the *Graham* factors.

Defendants contend that Officer Groce and Chief Roach are entitled to qualified immunity on the claims asserted against them in their individual capacity. (Dkt. 81 at 14-15). Defendants assert that no constitutional right existed here, but that, if the Court does find a right existed, the right was not clearly established at the time of the violation. (Dkt. 81 at 14; Dkt. 97 at 4-7). Plaintiff maintains that he was seized in violation of his Fourth Amendment rights, and that his right to be free from unreasonable seizure was clearly established at the time of the incident. (Dkt. 89 at 24-26).

"Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or

constitutional right of which a reasonable person would have known at the time."

*Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citations omitted). This doctrine

"gives government officials breathing room to make reasonable but mistaken

judgments about open legal questions. When properly applied, it protects 'all but

the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-*

*Kidd*, 536 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether a defendant is entitled to qualified immunity, courts

must determine: (1) whether the facts, taken in the light most favorable to the

plaintiff, show that the defendant violated a constitutional right; and (2) whether

that constitutional right was clearly established at the time of the alleged violation.

*McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012). "The first question is one of

law. The second requires a broader inquiry" which the Court will discuss later.

*Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). When the qualified

immunity inquiry cannot be disentangled from disputed facts, the issue cannot be

resolved without a trial. *Id.* (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir.

1996).

### i. Constitutional Right

In the Seventh Circuit, "the test for immunity should be whether the law was

clear in relation to the specific facts confronting the public official when he acted."

*Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Thus, the Court must assess

Officer Groce's actions in light of the particular circumstances facing her at the time

she entered Mr. Mitchum's yard, while accepting as true, the Plaintiff's account of

those circumstances. *Gonzalez*, 578 F.3d at 541. Taking as true, at this stage, Mr.

Mitchum's version of the facts, one could conclude that it was unreasonable for IMPD and Officer Groce to (1) deploy an aggressive, anti-social K9 known to accidentally bite bystanders and other police officers, (2) fail to give a verbal announcement upon entering an enclosed backyard, (3) fail to obtain a visual around an unknown corner where a bystander has previously been seen, and (4) pull K9 Obi "off strong" instead of using a verbal command to compel the dog to release the bite. Thus, as the Court has already concluded, one could reasonably conclude that Mr. Mitchum was subjected to excessive force.

### ii.   *Clearly Established Right*

Under this second inquiry, Mr. Mitchum bears the burden of establishing that the particular constitutional right that he maintains was violated was "clearly established" at the time of the alleged incident. *Volkman*, 736 F.3d at 1090. The difficulty with this inquiry is first identifying what right is in question. *Becker v. City of Evansville*, No. 3:12-cv-182-WGH-TWP, 2015 WL 328895, at *21 (S.D. Ind. Jan. 26, 2015). "The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality, and the Seventh Circuit has long held that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when [she] acted." *Volkman*, 736 F.3d at 1090 (citing *Ashcroft v. al-Kidd*, 563 U.S. at 742) (internal quotations omitted).

Mr. Mitchum is able to demonstrate this by (1) showing that there is "a clearly analogous case establishing a right to be free from the specific conduct at issue" or (2) showing that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v.*

*City of Chicago*, 242 F.3d 737, 742 (7th Cir.2001); *Est. of Escobedo v. Bender*, 600

F.3d 770, 780 (7th Cir. 2010) (citing *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th

Cir. 2001). A case directly on point is not required, "but precedent must have placed

the statutory or constitutional question beyond debate." *Altizer v. Retherford*, No.

1:14-cv-31-WTL-TAB, 2015 WL 3843668, at *3 (S.D. Ind. June 22, 2015) (quoting

*Ashcroft v. Al–Kidd*, 563 U.S. at 741. Also, a plaintiff can show that a constitutional

right has been clearly established without pointing to case law. *Becker*, 2015 WL

328895, at *22.

　　To determine whether Officer Groce and Chief Roach are entitled to qualified

immunity, the Court must determine whether the law clearly established, as of May

31, 2018, that a police officer violates a person's Fourth Amendment right to be free

from excessive force by: (1) directing a K9, trained to bite and hold the first person

he locates, into a person's enclosed yard without first issuing a warning; (2) failing

to obtain a visual around an unknown corner while employing an area search with

an inadequately trained K9 instructed to locate a human; and (3) pulling a K9 "off

strong" instead of using a verbal command to compel the dog to release the bite.

　　When looking at closely analogous cases to determine if a right was clearly

established at the time of the violation, the Court looks first to controlling precedent

on the issue from the Supreme Court and to precedent from this Circuit. *Est. of

Escobedo*, 600 F.3d at 781. In the absence of controlling precedent, the Court must

broaden the survey to include all relevant case law in order to determine "whether

there was such a clear trend in the case law that we can say with fair assurance

that the recognition of the right by a controlling precedent was merely a question of time." *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000)).

After a thorough search, the Court found one out of district case that addressed the specific question at issue. In *Tucker v. City of Lakewood*, No. 2:15-CV-05355, 2016 WL 6037983, at *1 (W.D. Wash. Oct. 14, 2016), police were called to a homeless camp where a male suspect had fled. A K9 officer deployed his dog to search the camp and surrounding woods for the male suspect. *Id.* The plaintiff bystander heard the K9 officer's initial warning and proceeded off the walking trail in compliance with the warning. *Id.* The K9 left the trail, engaged with the plaintiff bystander, and bit the plaintiff's leg, despite the plaintiff not being a suspect and not moving. *Id.* Taking the facts in the light most favorable to the plaintiff, the Court concluded that qualified immunity was not appropriate because any reasonable officer should have known that the K9 officer's decision to deploy his K9 into a wooded, park-like area where people were camping to pursue a non-violent suspect who was presumed but not confirmed to be in the camp area, and where the plaintiff was not a suspect or target of the search and was standing still off of the trail, was excessive. *Id.* at *4.

A similar analysis controls the Court's decision here. The second carjacking suspect was presumed, but not confirmed to be in Mr. Mitchum's neighborhood because a perimeter was not established. The search was conducted during the day in a neighborhood where individuals were out mowing the lawn and sitting on their back porches, injecting bystanders into the situation. The officers on scene, including Officer Groce, did not believe the suspect to be armed, and Sergeant

27

Patton confirmed that officer safety was not a concern when entering Mr. Mitchum's backyard. Mr. Mitchum was neither a suspect nor target of the search, but was sitting on the patio at the back of his residence. Moreover, taking the facts as presented by Mr. Mitchum, IMPD officers failed to issue a verbal announcement before entering his backyard. Accordingly, one could reasonably conclude that the Defendants should have known that their actions were excessive.

Other cases lend support for this conclusion. The Seventh Circuit in *Bey v. Cimarossa*, 202 F.3d 272 (7th Cir. 2000) concluded that summary judgment was inappropriate where the question of the issuance of a warning was a material disputed fact as to whether the arresting officer used excessive force and whether he was entitled to qualified immunity. The *Bey* court also pointed to V*athekan v. Prince George's Cty.*, 154 F.3d 173, 179 (4th Cir. 1998), which held that a failure to give a verbal warning before deploying a police dog into an unknown apartment where the plaintiff was sleeping was objectively unreasonable, and that a factual issue surrounding whether a verbal warning was given precluded summary judgment on qualified immunity grounds. This issue finds further support in the Eighth Circuit, which concluded that a jury may find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving a warning. *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 389 (8th Cir. 2007) (citing *Kuha v. City of Minnetonka*, 365 F.3d 590, 603–07 (8th Cir. 2004)); *compare with Johnson v. Scott*, 576 F.3d 658, 661 (7th Cir. 2009). Moreover, in *Collins v. Schmidt*, 326 F. Supp. 3d 733, 744 (D. Minn. 2018), the court concluded that a K9's apparent alert to a human triggered a requirement for the officers to issue a warning.

As discussed previously, it is not disputed that Officer Groce gave a verbal announcement of her intent to use a K9 when she began the initial track on 3200 N. Colorado, but it is disputed whether she gave any additional verbal announcements, specifically when she and Obi entered Mr. Mitchum's backyard and then once K9 Obi began pulling on the lead, a sign that he had found a human scent. There is evidence showing that IMPD knew of Mr. Mitchum's presence in his backyard and, yet, Mr. Mitchum was allegedly not given a warning that a K9 would be searching in his backyard. Thus, there is a genuine issue of material fact as to whether a warning was given before entering Mr. Mitchum's backyard that precludes summary judgment. Moreover, based on the facts of this case, the issue of whether the officers gave a verbal warning before entering the Plaintiff's yard is material to whether the Defendants used excessive force in seizing Mr. Mitchum and to whether Officer Groce is entitled to qualified immunity.

"Under an objective analysis, any officer who releases a trained police dog to subdue a suspect knows that he is directing the use of force that is much more likely to inflict serious injury than other methods, *see Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005), and has some obligation not to deploy the dog unreasonably." *Hood v. Koeller*, No. 1:05-cv-1484-RLY-WTL, 2007 WL 1468712, at *4 (S.D. Ind. May 18, 2007) (citing *Vathekan*, 154 F.3d at 178-79). The Seventh Circuit in *Johnson* did note that the deployment of a dog trained to bite and hold suspects is not unconstitutional *per se*, because various situations may warrant the use of a dog that has been trained and that is under the control of the handler. *Johnson,* 576 F.3d at 661 (7th Cir. 2009). As outlined before, there are disputed

facts about whether K9 Obi was adequately or consistently trained or under the control of Officer Groce.

The Sixth Circuit has noted that officers act contrary to clearly established law when the events occur in areas unlikely to expose police to ambush, the suspects are not believed to be armed, warnings are not provided, and where the "bite and hold" dog has been questionably trained. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 789 (6th Cir. 2012) (referencing *White v. Harmon*, 65 F.3d 169, 1995 WL 51886, at *3 (6th Cir. 1995)); *Rainey v. Patton*, 534 F. App'x 391, 396 (6th Cir. 2013).

As noted previously, the Court could not determine whether Plaintiff had established that the Defendants violated his constitutional right to be free from unreasonable seizure due to several remaining material factual disputes. If the Court had concluded that Defendants had violated Plaintiff's Fourth Amendment right, then these cases would demonstrate a clear trend in the law that Plaintiff's right was clearly established at the time of the incident. The Court cannot make that determination, however, because material factual disputes remain, and those disputes are better left for resolution at trial. Accordingly, Defendants' motion for summary judgment on qualified immunity grounds is denied.

**D. Defendants are not entitled to summary judgment on Mr. Mitchum's *Monell* claim because a reasonable factfinder could conclude that the failure to properly train IMPD K9 Officers reflected "deliberate indifference" and was the "moving force" behind Officer Groce's conduct.**

Mr. Mitchum alleges that the City of Indianapolis and IMPD Chief Taylor are liable under a failure to train theory because the officers in this case had not been

trained on the proper use of police canines. "[A] municipality is not vicariously liable for the constitutional torts of its employees but is answerable only for the consequences of its policies." *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A municipality may be liable under § 1983 if the Plaintiff can prove that "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Altizer v. Retherford*, No. 1:14-cv-31-WTL-TAB, 2015 WL 3843668, at *4 (S.D. Ind. June 22, 2015) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir .2010).

In *City of Canton v. Harris*, the Supreme Court held that a municipality's failure to provide adequate police training could be considered an actionable custom or policy under § 1983 only when the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. 378, 388 (1989). In the failure to train context, deliberate indifference can be established by showing that the municipality either "fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation" or "fails to provide further training after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted).

In their motion for summary judgment, the Defendants first argue that the Plaintiff's *Monell* claim against the City of Indianapolis and IMPD Chief Taylor should be dismissed because he cannot establish that a policy, practice, or custom caused a violation of his constitutional rights. (Dkt. 81 at 15-16). This argument fails because, as noted above, a municipality may be held liable under Section 1983 for a failure to train its employees. *Dunn*, 347 F.3d at 646; *see also Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 675 (7th Cir. 2012). Second, the Defendants maintain that even if the Court finds a constitutional violation here, Mr. Mitchum is unable to demonstrate "more than one instance" of IMPD canines biting innocent bystanders suddenly after encountering them triggering a responsibility for IMPD to conduct additional training. (Dkt. 81 at 16). This is not, however, the end of the Court's analysis for purposes of evaluating the Plaintiff's *Monell* claim.

A plaintiff may prevail on establishing municipal liability through a single unconstitutional incident authorized by a facially constitutional policy so long as he proves that the policy was the "moving force" causing his injury. *Becker*, 2015 WL 328895, at *28, *aff'd and remanded sub nom. Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016). As the Seventh Circuit explained in *Ross v. United States*, a municipal policy's authorization of unconstitutional conduct "represents a policy rightly attributed to the governmental entity, and in such a case, there is no need to resort to proof of the policy's multiple applications to attribute its existence to the municipality." 910 F.2d 1422, 1430 (7th Cir. 1990).

Here, it is slightly unclear based on the briefing, but Mr. Mitchum appears to be proceeding under this "single incident" theory of deliberate indifference. In his

Complaint, Mr. Mitchum contends that the City of Indianapolis showed deliberate indifference by failing to properly train, supervise and control IMPD K9 handlers and by enforcing a policy that permitted these inadequately trained handlers to use improperly trained police canines to seize innocent persons while conducting area searches. (Dkt. 1 at 6; Dkt. 89 at 26-27).

Sergeant Patton's testimony was that IMPD dogs who are given the command "zuch" are trained to "search to locate a person." (Patton 2019 Dep. 18:17-23; Dkt. 79-3 at 18). Sergeant Patton testified in 2017 in the *Mancini* case that dogs cannot be trained to differentiate between a guilty person and an innocent person because dogs do not have cognitive reasoning. (Patton 2017 Dep. 26:4-8, Dkt. 88-15 at 6). Sergeant Patton noted that a dog cannot distinguish which person may be "the bad guy we were looking for," but the dog knows when it finds a human scent and takes its handler to that scent. (Patton 2019 Dep. 20:17-21; Dkt. 79-3 at 20). Sergeant Patton also confirmed that IMPD dogs are then trained to bite and apprehend the person it has found. (Patton 2019 Dep. 22: 14-18; Dkt. 79-3 at 22). Sergeant Patton then stated that once Obi picked up on Mr. Mitchum's scent, Obi was going to engage and bite Mr. Mitchum. (Patton 2019 Dep. 26:15-18; Dkt. 79-3 at 26). According to Mr. Mitchum, IMPD's "bite and hold" policy resulted in its police dogs biting "more people than eleven other major metropolitan cities combined (including Chicago, New York, and Washington, D.C.)." (Dkt. 89 at 27) (emphasis omitted). Mr. Mitchum maintains that IMPD insistence in using this method, which goes against best practices, reflects deliberate indifference toward the Fourth Amendment by authorizing officers to use a method of tracking that encourages the

use of excessive force. (Dkt. 89 at 12). According to Mr. Mitchum, this training method constituted the moving force behind IMPD's unconstitutional use of force, thereby causing his dog bite injuries. (Dkt. 89 at 12).

Even though IMPD trains its K9s in the "bite and hold" method, it does not have a policy that requires a handler to issue a verbal command to recall the dog from a bite. (Dkt. 89 at 27). Instead, Sergeant Patton testified that IMPD's policy and his training method utilizes the "pull up strong" method of disengaging a K9 from a bite instead of a verbal recall command. (Patton 2019 Dep. 77:8-17; Dkt. 79-3 at 17). Plaintiff's expert testified that the "pull up strong method" encourages K9s to bite harder and for a longer duration, and that for any police department or administrator to allow patrol dogs to be pulled up strong is "beyond reckless." (Heyen Report, Dkt. 88-4 at 21). Mr. Heyen also indicated that a dog that re-engaged, such as how Obi bit Mr. Mitchum a second time after releasing his left calf, may indicate that it was not properly trained or maintained. (Heyen Report, Dkt. 88-4 at 21). Moreover, IMPD's hired consultant from the Los Angeles Police Department, Michael Goosby, agreed with Mr. Heyen and recommended that all IMPD K9 handlers utilize a verbal recall command instead of using the "pull up strong" method as a default. (Goosby Report, Dkt. 88-13-at 2). A reasonable factfinder could look at IMPD's policy and practice to train a dog to find a scent, bite the individual belonging to that scent, and then forcibly remove the dog from the bite (potentially causing more physical damage), and conclude that the policy directly led to Mr. Mitchum's injuries in this case.

Sergeant Patton testified that IMPD does not have a policy that dictates when a K9 shall be removed from service due to improper behavior such as too many accidental bites, and that he could recall only one dog being removed from service due to too many accidental or unintentional bites. (Patton 2019 Dep. 98:12-99:10, Dkt. 79-3 at 98-99). Mr. Mitchum has offered the opinion of Mr. Hartsock, who stated in this report that Mr. Mitchum's bite was preventable because IMPD failed to take corrective action until after Obi had already bitten three individuals. (Hartsock Report, Dkt. 88-7 at 3). A reasonable factfinder could conclude that IMPD's failure to remove K9s from the field after demonstrating a pattern of accidental bites without remedial training directly led to Mr. Mitchum's injuries here.

Additionally, Officer Groce operated an Instagram account for Obi, with the approval of IMPD. (Stradling Dep. 10:21-11:9, Dkt. 79-8 at 4). On that account, Officer Groce would answer questions from the public as to Obi's care, training, or habits. On one such occasion, Officer Groce was asked: "What do you use as a reward at the end of a successful live track?" (Dkt. 88-9 at 1). Officer Groce responded: "[t]he bite itself is the reward, but if it's a civil apprehension with no bite I will give him his Kong later." (Id.). Sergeants Patton and Hedden testified that IMPD K9s are not trained that the bite is the reward, and that they were unclear why Officer Groce would indicate as such. (Hedden Dep. 28:11-21, Dkt. 79-5 at 8; Patton 2019 Dep. 23:19-23, Dkt. 79-3 at 23). Plaintiff's experts testified that IMPD's K9 training reinforces the belief that the bite is the reward, regardless of whether the training officers label the reward in that manner. For example, Mr. Hartsock

testified that the basic principle in dog training called operant conditioning means that you will increase the likelihood of a behavior if you reinforce that behavior; as such, when IMPD immediately plays tug of war or throws a ball after the dog bites in training, the dog begins to be conditioned that it will get a reward if it bites. (Hartsock Dep. 73:9-75:15, Dkt. 88-8 at 5).

This question of whether IMPD K9s are trained and reinforced to think that the bite is their reward is particularly important, given the Plaintiff's designated evidence that IMPD K9s have the highest rate of dog bites among police departments in the largest 20 cities and bit more people than eleven other major metropolitan cities combined from 2017 to 2019. (IndyStar Article, Dkt. 88-12 at 1-2). A reasonable factfinder could conclude that IMPD knew of Officer Groce's handling of K9 Obi and her approach to the proper reward for completing a bite because her Instagram account was approved by IMPD, and find that it was unreasonable for her to still be permitted to use K9 Obi in the field.

Finally, IMPD did not have any policies or requirements related to required initial or maintenance training for handlers or K9s. (Heyen Report, Dkt. 88-4 at 20). IMPD's training manual was written by Sergeant Patton, and is only based on his own experience with K9 training. (Patton 2019 Dep, 88:17-90:10; Dkt. 79-3 at 88-90). Mr. Hartsock indicated in his report that Sergeant Patton evaluates dogs and handlers based on their compliance with his training program, which limits any opportunities for outside input or criticism. (Hartsock Report, Dkt. 88-7 at 5). Mr. Hartsock also stated he has never seen another K9 Training Manual that is only based on one person's experience with no outside sources. (Id.). Mr. Hartsock also

concludes that the Manual itself contains incorrect information, such as a mischaracterization of the concept Positive Punishment. (Id.). Moreover, he states that if the Manual contained information such as the guidelines for implementing corrective action when a dog behaves outside of training, such as biting an innocent bystander, then the bite of Mr. Mitchum may have been prevented. (Id. at 9-10).

A reasonable factfinder could conclude that IMPD's practices would result in the type of constitutional violation that happened to Mr. Mitchum. As such, the Plaintiff could satisfy the "deliberate indifference" standard and thus the Defendants' motion for summary judgment on Plaintiff's *Monell* claim is denied.

### E. Defendants are not entitled to summary judgment on Mr. Mitchum's negligence claims due to remaining factual disputes.

Defendants finally argue that Plaintiff's negligence claims fail because IMPD and the City are immune under the Indiana Tort Claims Act and the claim against Officer Groce was not properly plead. (Dkt. 81 at 16-21).

*a. IMPD*

Plaintiff's complaint argues that Defendant IMPD breached its duty of reasonable care by failing to adequately train the K9 unit. (Dkt. 1 at 7-8). Defendants are correct that, generally speaking, "[a]ny state law claims of negligent training, supervision, and/or discipline are barred by the discretionary function immunity provision of the Indiana Tort Claims Act ("ITCA")." *Coleman v. Curry*, No. 1:11-cv-01256-TWP-DKL, 2013 WL 5232196, at *9 (S.D. Ind. Sept. 16, 2013). Plaintiff is also correct that a narrow exception exists for this immunity – an official's supervisory conduct does not merit exemption from suit if it "violate[s]

clearly established statutory or constitutional rights of which a reasonable person should have known." *Hudkins v. City of Indianapolis*, No. 1:13-cv-01179-SEB-DML, 2015 WL 4664592, at *24 (S.D. Ind. Aug. 6, 2015) (citing *Cantrell v. Morris*, 849 N.E.2d 488, 496 (Ind. 2006). As the language indicates, discretionary function immunity under Indiana law is thus co-extensive with qualified immunity under the federal Section 1983 standard. *Id.*

As discussed previously, the Undersigned found that genuine issues of material fact exist that preclude summary judgment on qualified immunity grounds. Thus, the same reasoning applies to Plaintiff's negligence claim against IMPD, and summary judgment is denied on this issue.

### b. Officer Groce

Defendants contend that Plaintiff's claim against Officer Groce for negligence fails because it does not allege the necessary requirements under the ITCA. (Dkt. 81 at 18-21). Defendants note that Plaintiff cannot point to any evidence showing that Officer Groce's actions were criminal, clearly outside the scope of her employment, malicious, willful and wanton, or calculated to benefit her personally. (Id. at 18-19). In response, Plaintiff argues that Officer Groce's actions were willful and wanton based on the disputed facts in this case. Specifically, Plaintiff points to the fact that Officer Groce was aware of Obi's anti-social behavior and his history of biting two innocent bystanders before Mr. Mitchum; that Obi was trained to find and bite and hold the first person he found, and that once Obi had bitten an individual she would disengage him by using the "pull up strong" method; and that she deployed Obi during the early afternoon in a residential area without providing a warning before

entering Mr. Mitchum's backyard. These disputed facts precluded summary judgment on qualified immunity grounds, and the same analysis holds true here. A reasonable factfinder could conclude that Officer Groce's conduct was willful and wanton and, thus, summary judgment is denied on this issue.

    *c. City of Indianapolis*

Finally, Defendants argue that the City of Indianapolis is immune from liability as to Plaintiff's negligence claim for Officer's Groce's actions, pursuant to the "law enforcement immunity" provision of the ITCA. (Dkt. 81 at 19-21). The law enforcement immunity provision provides that "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against an employee personally." *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006) (citing Ind. Code § 34–13–3–5(b)). "Further, 'to receive immunity under this section of the ITCA, a defendant must: (1) be engaged in the enforcement of law; and (2) act within the scope of employment.' " *Branson v. Newburgh Police Dep't*, 849 F. Supp. 2d 802, 813 (S.D. Ind. 2011) (citing *Hendricks v. New Albany Police Dept.*, 749 F. Supp. 2d 863, 873 (S.D. Ind. 2010)).

It is not disputed that Officer Groce was acting in the scope of her employment as an IMPD officer on the day in question. As such, the City of Indianapolis is immune from Plaintiff's negligence claim unless an exception applies. Immunity does not apply to claims of assault, battery, or excessive force. *Reiner v. Dandurand*, 33 F. Supp. 3d 1018, 1032 (N.D. Ind. 2014) (citing *Wilson v. Isaacs*, 929 N.E.2d 200, 204 (Ind. 2010)). This Court in *Fidler* noted that the excessive force standard effectively parallels the federal standard. *Fidler*, 428 F.

Supp. 2d at 866). The *Fidler* Court determined that genuine issues of material fact precluded summary judgment on the plaintiff's Fourth Amendment argument, and that because the negligence analysis involved the same facts as the Fourth Amendment argument, also declined to enter summary judgment as to the plaintiff's negligence claim.

The same analysis applies to the present case. Because genuine issues of material fact prevent the Court from granting summary judgment on Plaintiff's § 1983 claims, Plaintiff's state law claim of negligence is similarly precluded from summary judgment.

## IV. Conclusion

For the reasons stated above, the Defendants' Motion for Summary Judgment, Dkt. [78], is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's Fourteenth Amendment claim is dismissed with prejudice. The remaining claims shall proceed to trial in accordance with this Order.

So ORDERED.

Date: 7/12/2021

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email